**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00419(TFH)** |
| **v.** | : | |
| | : | |
| **JOHN J. JURAN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence John J. Juran to 60 days of home detention, as part of a three-year term of probation, 60 hours of community service, and $500 in restitution.

### I.    Introduction

Defendant John J. Juran participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars' of property damage.

Juran pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of 60 days' home detention is appropriate in this case because he: (1) he witnessed individuals shoving and overtaking law enforcement officers on the West Front of the Capitol; (2) he penetrated the U.S. Capitol and entered the Parliamentarian's Office; and (3) he destroyed unrecovered evidence by deleting photographs and videos that he captured on his phone while inside the Capitol.

1

Even if he didn't personally engage in violence or property destruction during the riot, the Court must consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.

Here, the defendant's participation in a riot that actually succeeded in halting the Congressional certification renders a sentence of 60 days' home detention both necessary and appropriate. Furthermore, the aggravating factors above explain why probation only is not warranted in this case.

## II. Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 16 (Statement of Offense), at ¶¶ 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### *Juran's Role in the January 6, 2021 Attack on the Capitol*

On or about January 5, 2021, Juran traveled with friends from Buffalo, New York to Washington, D.C. to attend the "Stop the Steal" rally at the Ellipse near the White House. After attending the rally, Juran walked to the United States Capitol Building.

At approximately 2:03 p.m., armor-clad law enforcement officers were engaged with members of a mob, some of whom were assaulting officers, on the West Front of the U.S.

Capitol Building. The United States Capitol Police had also set up amplification equipment that

repeatedly broadcast an order commanding the crowd to disperse. In conjunction with

that amplified recording, law enforcement were deploying crowd control munitions against the

mob. Image 1, captured at approximately 2:23 p.m., depicts what the West Plaza of the U.S.

Capitol Building looked like on January 6, 2021.

Image 1



Image 2 depicts what the West Plaza looked like at approximately 2:26 p.m.

Image 2



At approximately 2:26 p.m., a mob that included Juran, walked past torn down bike racks and climbed the steps leading to a non-public entrance to the U.S. Capitol Building, identified as the Parliamentarian's door on the Senate side of the building. Location data indicates that Juran's cell phone was present nearby and inside the Capitol from approximately 2:29 through 2:59 p.m.

Rioters breached the Parliamentarian's Door at approximately 2:42 p.m. and Juran entered the Capitol at approximately 2:49 p.m. Once inside the Capitol, Juran briefly walked into the Parliamentarian's Office. As shown in Images 3-5, surveillance video captured images of Juran inside the Capitol at approximately 2:55 p.m.

Images 3-5







Juran remained inside the Capitol Building for approximately 10 minutes, when he was told to leave by law enforcement officers. He exited the Capitol Building also through the doors near the Parliamentarian's Office at approximately 2:59 p.m.  At the time, law enforcement

5

officers were deploying flash bang devices and smoke bombs to encourage individuals to exit the Capitol.

The government does not have evidence that Juran personally engaged in any destructive or violent activity while inside the Capitol Building.

*Juran's Proffer*

Juran and his attorney agreed to a proffer on September 30, 2021. He stated that he attended the "Stop the Steal" rally and left before it was over to walk to the Capitol at President Trump's direction with the intent of engaging in a protest.

Once he arrived on the Capitol's grounds, Juran walked over knocked down barriers and pushed aside bike racks. As he got closer to the Capitol, he saw individuals on a media tower and he took a position at the bottom of the tower. He saw people shoving law enforcement officers. Afterward, Juran joined a crowd that ascended stairs which led to a door to the Capitol and he entered through that door. After entering the Capitol, he saw a sign for the Parliamentarian's Office and he entered that office and took photographs. Seconds later, he exited the Parliamentarian's Office and traveled down hallways leading him farther into the Capitol Building. He traveled approximately 100 feet and was then told to leave by law enforcement officers. They said, "It's time to go," and they were setting off smoke bombs at the time. Juran stated that he turned around and started heading toward the door where he entered the Capitol and left through that door. It took him a long time to get back to the door.

After January 6, 2021, Juran acknowledged that he destroyed evidence that he had from January 6, including all of the photos that he took while inside the Capitol, because he thought it was something that he should not have.

In sum, Juran accepted responsibility for his actions and admitted that he entered the Capitol Building on January 6, 2021.

*The Charges and Plea Agreement*

On April 21, 2021, John J. Juran was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On May 19, 2021, he was arrested in New York. On June 21, 2021, Juran was charged by four-count Information with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On December 1, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. Under the plea agreement, Juran agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

Juran now faces sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000.[1] He must also pay $500 in restitution under the terms of the plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, §

---

[1] Because Juran has pleaded guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of the recommended sentence of 60 days home detention, three years' probation, and 60 hours of community service.

### A.   The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. As a person entered the Capitol, they would—at a minimum— have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air. Make no mistake, no rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the

defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

To be clear, had Juran personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants. The defendant's lack of violence and property destruction is the only reason he was charged only with, and permitted to plead to, a misdemeanor rather than a felony.

Juran arrived on the grounds of the U.S. Capitol and entered the Capitol Building at approximately 2:29 p.m. In order gain entry to the Capitol at that time, he would have crossed over broken down barricades and pushed aside bike rakes that were intended to prohibit presence in the restricted area of the Capitol's grounds. Prior to entering into the Capitol, he would have witnessed individuals on scaffolding and on the media tower on the West Front of the Capitol and seen individuals confronting law enforcement officers, as shown in Images 1 and 2. Despite these circumstances, Juran joined a crowd that advanced toward the Capitol Building and, with the crowd, made entry into the Capitol Building through a non-public entrance near the Parliamentarian's Office. Thus, he took advantage of the opportunity presented by the mob, ignored the violence taking place, and unlawfully entered the Capitol.

While inside the Capitol and over the course of approximately 10 minutes, Juran took photographs and videos and explored the surroundings despite sirens blaring throughout the building and law enforcement officers deploying smoke bombs. Eventually, Juran departed along

with other rioters that law enforcement officers had begun to encourage or force to exit the building. Under all of these circumstances, Juran knew that he was not welcomed into the Capitol, but he entered it and remained inside anyway.

After leaving the Capitol, Juran destroyed the photographs and/or video that he recorded while inside the Capitol.

Therefore, the nature and circumstances of the offense supports the recommended sentence of 60 days home detention

### B.    The History and Characteristics of the Defendant

As set forth in the PSR, Juran is 52 years old and is a life-long resident of New York. ¶ 39. Since 1999, he has been self-employed as the owner of Jack's Nuisance Wildlife Removal Corporation in Williamsville, New York. ¶ 62.

Juran's criminal history includes one conviction, for DUI in 1999. For that offense he was fined and lost his driving privileges. ¶ 33.

Following his arrest for the charges in this case, Juran, through his attorney, expressed remorse for his criminal conduct and a desire to plead guilty, acknowledge his conduct, and promptly resolve his case. When recommending an appropriate sentence, the government gives significant weight to the defendant's early resolution of this case.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the

democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected").

### D.     The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 24 ("What happened on that day was nothing less than the attempt of a violent mob to prevent the orderly and peaceful certification of an election as part of the transition of power from one administration to the next, something that has happened with regularity over the history of this country. That mob was trying to overthrow the government.") (statement of Judge Chutkan).

It is also important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Juran's conduct on January 6 demonstrates the need for specific deterrence. In entering the Capitol, he stepped over barricades and walked around bike rakes, he ignored the violence taking place on the grounds of the Capitol between rioters and law enforcement officers, but chose to join the mob that stormed into the Capitol Building. Apparently unconcerned, he

meandered into the Parliamentarian's Office and took photographs and video of his journey, but he was no mere tourist and these were not normal visiting hours or circumstances. He was only able to gain entry into the Capitol Building because of the riot and he stayed in the building for approximately 10 minutes and only left when directed to do so by law enforcement officers. Although his actions at the Capitol on January 6 were more limited than many others', his actions contributed to the danger and violence of that day by increasing the size of the crowd inside restricted areas and the Capitol itself.

Unlike some other January 6 defendants, Juran has accepted responsibility for his actions and indicated his remorse. Thus, his conduct suggests a lesser need for specific deterrence than in some other cases. A period of 60 days of home detention, 36 months of probation, and 60 hours of community service will adequately serve that purpose.

### E.    The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[3] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A

---

[3]    Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

probationary sentence should not necessarily become the default.[4] The government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 21-cr-164 (RCL), Tr. 6/23/2021 at 19.

The government and the sentencing courts have already begun to make distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long they remained inside, the nature of their conduct inside the Capitol, any statements (on social media or otherwise), etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a

---

[4]     Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-164 (RCL); *United States v. Valerie Elaine Ehrke*, 21-cr-97 (PFF); *United States v. Donna Sue Bissey*, 21-cr-165 (TSC), *United States v. Douglas K. Wangler and Bruce J. Harrison*, 21-cr-365 (DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants

were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

One of the most famous photographs from January 6 is that of a rioter in Speaker Pelosi's office, with his feet on her desk. *See* Amended Complaint, *United States v. Richard Barnett,* 21-cr-38, ECF No. 3, at 2. That photograph has become notorious likely for exactly this reason, because of what invading the office of a member of Congress represents: a show of intimidation, an attempted display of power, above and beyond entering the building. As noted above, while Senator Merkley's office was not labeled as such, it was clearly recognizable as a private office,

and thus implicates similar concerns. Another rioter, Brandon Fellows, recognized it as some sort of "Oregon room."  Affidavit, *Fellows, supra*, ECF No. 1 at ¶ 15.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room. Judge Boasberg sentenced the defendants each to 45 days of incarceration. A misdemeanant who reached the Senate Floor, even though she does not appear to have known where she was, also received a sentence of incarceration. *United States v. Courtright*, No. 21-cr-72 (CRC) (30 days incarceration, one year supervised release).

Like Jancart and Rau, Andrew Ericson went to the Speaker's Conference Room; he posed for a selfie there, as well as for as a photograph resting his feet on the conference table. Ericson took a beer from a mini-fridge. Gov. Sentencing Mem., *United States v. Andrew Ericson*, 21-cr-506 (TNM), ECF No. 37 at 3.  Ericson posted his involvement to social media. *Id.* at 4. Ericson was aware of the crowd outside. See id. at 3, 7-8, 13. The government recommended 60 days' jail time and Judge McFadden imposed a sentence of 20 days' imprisonment, discussing the defendant's entry into an office as follows: "That's a private area and your violation of that space suggests a certain brazenness and intentionality that requires consideration in your sentence. You could have caused a very dangerous and fearful scene had the speaker or her staff been present in the office when you and others entered it."  *Ericson*, Tr. 12/10/21 at 21. Judge McFadden concluded that entering offices put Ericson in a "different category" than people "who were only in areas that would normally be open for tours." *Id.*

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), the defendant pled guilty to a misdemeanor charge of 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating or picketing in a

Capitol Building) in connection with spending time inside the Spouse's Lounge of the Capitol, and Judge Chutkan sentenced the defendant to 45 days of incarceration. While inside the Spouse's Lounge, Mazzocco warned others not to take or destroy anything and said that they were probably going to get in trouble for what they were doing—unlike Bonet, who lit a joint. Gov. Sentencing Mem., *Mazzocco*, 21-cr-54, ECF No. 28 at 6. Like Bonet, however, Mazzocco took smirking photographs of himself during the riot. *Id.* at 2, 12. He was also aware of the crowd outside the Capitol and entered through the Senate Wing Door not long before Bonet did. *See id.* at 3, 7-8, 13.

Another defendant who entered an office space, Charles Pham, also recently received a sentence of 45 days' imprisonment. *United States v. Charles Pham,* No. 21-cr-109 (TJK). While Pham was an active-duty police officer who downplayed his conduct to the FBI, other facts of his case resemble Bonet's: he saw confrontations between rioters and police before entering; he yelled "we're taking the house back!," he was inside the building for approximately 20 minutes. Gov. Sentencing Mem., *Pham*, ECF No. 36, at 2.

The government also acknowledges Felipe Marquez, who also entered Senator Merkley's office and received a sentence of three months' home detention; the government had recommended four months' incarceration. *United States v. Marquez,* 21-cr-136 (RC). Judge Contreras, however, explained that Marquez's documented mental-health issues had a "significant influence" on his sentence, and believed that probation would best allow Marquez to receive mental-health treatment. *Marquez,* Tr. 12/10/21 at 32, 34, 37. One other defendant who entered Senator Merkley's office also received a probationary sentence, but he was a 68-year-old retiree with no criminal record who was there for less than a minute, and there was no evidence that he engaged in any flagrant conduct while there. *See United States v. Edwards,* 21-cr-366 (JEB).

In any event, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). "[E]very sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.       Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Juran to 60 days of home detention, 36 months of probation, 60 hours of community service, and $500 restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW GRAVES
UNITED STATES ATTORNEY

By:     /s/ Anita Eve
ANITA EVE
Assistant United States Attorney, Detailee
PA Bar No. 45519

**CERTIFICATE OF SERVICE**

On this 17th day of February, 2022, a copy of the foregoing was served upon all parties

listed on the Electronic Case Filing (ECF) System.

/s/ Anita Eve
Anita Eve
Assistant United States Attorney